IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| TRACI GUYNUP, | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | No. 06-4315 |
| LANCASTER COUNTY, et al. | : | |

## MEMORANDUM RE:  MOTION FOR NEW TRIAL

**Baylson, J.**                                                                 **March 3, 2009**

Presently before this Court is Plaintiff's Post-Trial Motion for a New Trial (Doc. 113, as amended by Doc. 118).  For the reasons that follow, Plaintiff's Post-Trial Motion for a New Trial will be denied.

## I.    Background and Procedural History

Plaintiff Traci Guynup instituted the current action against Defendants Lancaster County, the Lancaster County Prison Board, and numerous employees of the Lancaster County Prison, alleging violations of 42 U.S.C. § 1983, the Americans with Disabilities Act, the Rehabilitation Act, and several state common law tort claims.  All of the claims arose out of the time that Guynup spent in the prison as a pre-trial detainee, from around December 13, 2005 through September 12, 2006, and as a sentenced prisoner, from around September 28, 2006 through January 23, 2007.

After granting Defendants' Motion for Summary Judgment on Plaintiff's Monell claim (Doc. 73), Guynup v. Lancaster County, 2008 WL 4682612 (E.D. Pa. Oct. 21, 2008), and later providing some clarification on this Court's holdings (Doc. 75), Guynup v. Lancaster County, 2008 WL 4771852 (E.D. Pa. Oct. 29, 2008), Guynup voluntarily dropped all of the claims

-1-

relating to her time as a sentenced prisoner and proceeded to trial on the remaining claims concerning her time as a pre-trial detainee.  After several days of trial from December 2, 2008 to December 5, 2008 (Doc. 93-94, 96-98, 100, 111-12), the jury returned a verdict in favor of Defendants on all counts (Doc. 107), and Judgment was subsequently entered for Defendants and against Guynup (Doc. 108, 109).

Guynup subsequently filed both a Post-Trial Motion for New Trial (Doc. 113) and a Motion to Be Excused from Ordering a Trial Transcript (Doc. 115).  This Court granted Plaintiff's Motion to Be Excused from Ordering a Trial Transcript and ordered the parties to submit amended briefs with citations to the audio record.  (Doc. 117).  Both parties have provided supplemental briefs, and Plaintiff's Post-Trial Motion for a New Trial is now ripe for decision.

## II.    Standard of Review for Motion for a New Trial

Rule 59 of the Federal Rules of Civil Procedure allows a trial court, in its discretion, to grant a new trial "on all or part of the issues in an action where there has been a trial by jury, for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States."  Fed. R. Civ. P. 59(a)(1).  Such an endeavor is not, however, lightly undertaken, because it necessarily "effects a denigration of the jury system and to the extent that new trials are granted the judge takes over, if he does not usurp, the prime function of the jury as the trier of the facts."  Lind v. Schenley Indus., Inc., 278 F.2d 79, 90 (3d Cir. 1960) (en banc).  Therefore, "[a] new trial may be granted [only] when the verdict is contrary to the great weight of the evidence; that is, 'where a miscarriage of justice would result if the verdict were to stand.'"  Pryer v. C.O. 3 Slavic, 251 F.3d 448, 453 (3d Cir. 2000) (quoting Olefins Trading, Inc. v. Han

Yang Chem. Corp., 9 F.3d 282, 289 (3d Cir. 1993)).

When the asserted basis for a new trial is the that jury verdict is against the weight of the evidence, "the district court ought to grant a new trial only when the record shows that the jury's verdict resulted in a miscarriage of justice or where the verdict, on the record, cries out to be overturned or shocks our conscience." Klein v. Hollings, 992 F.2d 1285, 1290 (3d Cir. 1993); EEOC v. Delaware Dep't of Health and Social Servs., 865 F.2d 1408, 1413 (3d Cir. 1989). In making this determination, the Court should consider the character and complexity of the evidence that the jury considered; the Court has less leeway to substitute its judgment for that of the jury where the subject of the litigation is "easily comprehended by any intelligent layman." See Lind, 278 F.2d at 88-91.

When the asserted basis for a new trial is trial error by the judge, "the court's inquiry . . . is twofold. It must first determine whether an error was made in the course of the trial, and then must determine whether the error was so prejudicial that refusal to grant a new trial would be inconsistent with substantial justice." Farra v. Stanley-Bostitch, Inc., 838 F. Supp. 1021, 1026 (E.D. Pa. 1993).

**III.    Discussion**

Guynup argues that her Motion for a New Trial should be granted for three reasons: (1) the jury's verdict was against the great weight of the evidence; (2) the Court improperly instructed the jury that, under the Prison Litigation Reform Act ("PLRA"), Guynup was required to show an actual physical injury in order to recover any compensatory damages; and (3) the Court improperly denied Plaintiff's counsel an opportunity to object to the physical injury charge outside of the hearing of the jury in violation of Rule 51(b)(2) of the Federal Rules of Civil

Procedure. Guynup limits her request for a new trial and all of her arguments to her claim under the Americans with Disabilities Act.

### A.   Great Weight of the Evidence

First, Guynup contends that the jury's verdict for the Defendants on her ADA claim was against the great weight of the evidence. Guynup rests her argument on two witnesses whose deposition testimony was read to the jury at trial: Warden Vincent Guarini and Deputy Warden for Treatment Robert Siemasko. Guynup first highlights the testimony of Warden Guarini when he stated that: (1) there was a county policy providing that the prison will be in compliance with the ADA;[1] (2) Warden Guarini never received any training with regard to the ADA;[2] (3) none of the prison staff had the responsibility of ensuring that the corrections officers were trained in the ADA;[3] (4) the Warden's review of policies concerning inmates with mental illness was limited to "policies other than suicide status, preventive policies, that's basically it, nothing—not medical policies";[4] (5) there was no medical housing unit for female inmates or pre-trial detainees as

----

[1] See (Doc. 111, Audio 12/04/08, Morning, 00:53:28 - testimony of Warden Guarini) ("Q: Are you responsible for any policies related to the Americans with Disabilities Act? A: The–not precisely, no. . . . Q: Yes, who is precisely responsible for those policies? A: If there was an issue, we would address that possibility with the county engineer, or something of that sort. As far as I know, there have been no issues on that. Q: Well, the prison does have an ADA policy, correct? A: The county does, and the prison is part of the county, that we will be in compliance with ADA.").

[2] See (Doc. 111, Audio 12/04/08, Morning, 00:55:24 - testimony of Warden Guarini) ("Q: Have you received any training with regard to the Americans with Disabilities Act? A: Any training may have come through a program or a seminar I may have attended. Other than that, no. Q: Do you recall any training specifically related to the ADA that you have received? A: No. I know that there had been some training sessions over the past 37 years, but no.").

[3] See (Doc. 111, Audio 12/04/08, Morning, 00:58:49).

[4] See (Doc. 111, Audio 12/04/08, Morning, 01:00:12).

there was for male inmates or pre-trial detainees;[5] (6) there was no peer to peer counseling within

the prison for inmates that had mental illness;[6] and (7) the prison was required to take individuals

with mental illness.[7]  Guynup also notes that Deputy Warden Siemasko confirmed that he too did

not receive ADA training.[8]  These statements, Guynup contends, show that Defendants did not

take the necessary steps to "ensure access to psychiatric services, or that corrections officers were

trained regarding the ADA." (Pl.'s Memo. L. Supp. Of Mot. New Trial at 3).

    However, Guynup's exclusive use of these statements ignores other statements made by

Guarini and Siemasko that undercut her argument. In addition, the testimony of several other

witnesses who dealt with Guynup during her time in the prison also supports the jury's verdict on

the ADA claim.

        1.    **Warden Guarini and Deputy Warden Siemasko**

---

    [5] See (Doc. 111, Audio 12/04/08, Morning, 01:02:25 - testimony of Warden Guarini) ("Q: Where is the medical housing unit here at the Lancaster County Prison? A: Medical housing unit for males is on the lower floor. For females, it is actually on two sections: upper 2-5 and also D block. Q: Other than 2-5 and D block, are there any other housing units here for females? A: No.").

    [6] See (Doc. 111, Audio 12/04/08, Morning, 01:22:02 - testimony of Warden Guarini) ("Q: Are there any programs for inmates with mental illness? A: Uh, there's no program specifically for mental illness directed towards that. However, some programs do get into counseling on that. Q: Which programs? A: Actually, they're out right now. In other words, basically, there's a program with peer-to-peer counseling operating in the institution. And again, some of these are periodic. Some people may come in and have a voluntary program, and then basically after a while they lose interest and leave us. Q: Was the peer-to-peer program available back in 2006. A: Not the present one, no. Q: How about 2007? A: No, not in 2007. I believe it started in January of this year.").

    [7] See (Doc. 111, Audio 12/04/08, Morning, 01:28:33).

    [8] See (Doc. 111, Audio 12/04/08, Morning, 01:40:20 - testimony of Deputy Warden Siemasko) ("Q: Have you attended any training relating to the Americans with Disabilities Act? A: No, not that I recall.").

-5-

First, this Court will address the Guarini statements highlighted by Guynup.  The first Guarini statement suggestive of liability is that Warden Guarini never received any training in the ADA.  See (Doc. 111, Audio 12/04/08, Morning, 00:55:24).  However, Warden Guarini made subsequent statements concerning disability training that undercut Guynup's argument.  For instance, later statements suggest that he simply did not remember at the time whether he attended any training that specifically dealt with the ADA.[9]  These statements also do not imply that Warden Guarini's actions ever violated the ADA, only that he could not remember whether he ever attended an ADA training session.

Next, Guynup highlights testimony by Guarini that no one was responsible for ensuring that the corrections officers received training in the ADA.  See (Doc. 111, Audio 12/04/08, Morning, 0:58:49).  Later on in the testimony, though, Guarini notes that there was mandatory training for employees in dealing with inmates who had a mental illness.[10]

The fifth statement highlighted by Guynup is that there was no specific and exclusive medical housing unit for females.  See (Doc. 111, Audio 12/04/08, Morning, 01:02:25).  Guarini did not testify, however, that there was no medical housing at all for women.  Instead, he stated that specific cells were used by the prison in the "2-5" to house mentally ill female patients.  See

---

[9] (Doc. 111, Audio 12/04/08, Morning, 0:56:15) ("Q:  So over the past 30-some years, where might you have got this ADA training?  A:  Anything of a voluntary nature, seminars.  There was 'What's New in the Law.'  Things of that sort.  Anything basically even potentially to, say training from the expansion project that we had in the 90's.").

[10] See (Doc. 111, Audio 12/04/08, Morning, 01:29:53) ("Q:  Is there any mandatory training regarding the Americans with Disabilities Act?  A:  No.  Q:  Any mandatory training regarding inmates with mental illness?  A:  Yes.  Basically, that would fall into suicide prevention, what signs to look for, how to interact with a mentally ill individual, cultural awareness, cultural training sensitivities.").

(Doc. 111, Audio 12/04/08, Morning, 01:02:25). And, as to "D block," Warden Guarini testified that, while specific cells were not designated for female inmates with mental illness, mental counselors got involved in choosing which cells were appropriate for a specific prisoner after an individualized assessment of the inmate's mental illness.[11]

More importantly, Guynup's reliance on the testimony of Warden Guarini misses the mark. Given the jury charge, which was derived from Guynup's proposed instructions, the jury verdict essentially concluded that Lancaster County did not (1) deny Ms. Guynup access to medical or psychiatric services; (2) fail to modify or reasonably accommodate the prison services; (3) fail to properly train its employees to accommodate Ms. Guynup's disability; or (4) otherwise discriminate against Ms. Guynup due to her disability in the services, programs, or activities that Lancaster County offered in the prison. See (Doc. 98, Audio 12/05/08, Mid-Morning, 03:03:40) (jury instructions as to elements for ADA claim). In her Motion, Guynup's arguments focus on ADA training and prison policy. However, Warden Guarini testified that he had essentially no involvement in crafting the medical policy for the prison.[12] And, as to training

---

[11] See (Doc. 111, Audio 12/04/08, Morning, 01:04:17) ("Q: Can an inmate with mental illness be housed on D block? A: Yes. Q: What would determine where the individual with mental illness was held? A: Well, number one, space-wise, just general numbers, females in the institution. The second thing is where the mental health counselors may designate, depending on the nature of the mental illness, the degree of the mental illness.").

[12] See (Doc. 111, Audio 12/04/08, Morning, 01:18:22) ("Q: What is involved in your oversight? A: They're one of the several different prison departments. If somebody says, you know -- Say a mother calls in, my daughter isn't getting proper medical. Or a son isn't getting proper medical. I'll basically get a hold of medical or the Deputy Warden of Treatment and say 'Look,' and say 'Look into this.' Or I'll have a direct comment relayed back to me, and I'll get back to the family with whatever the results would be. Other than that, I'm not a medical person. I would get into it, more of, you know, we found a syringe or something like that. In other words, operationally, between the prison having an operation and the medical operating within the prison. Q: And who's the Deputy Warden for Treatment that you're referring to? A:

-7-

for prison employees in dealing with individuals who had disabilities, Sergeant Steberger

testified that all staff attended a yearly class for such training,[13] and Deputy Warden Siemasko

later testified that he received training to deal with individuals with mental illness.[14]

### 2.   Other Evidence

In their Response, Defendants point to certain pieces of evidence introduced at trial that

undercut Plaintiff's argument and support the jury's verdict.  First, Guynup herself admitted to

receiving psychiatric treatment in the prison from several doctors, nurses, and counselors during

her nine-month stay as a pretrial detainee.[15]  She also admitted during cross-examination that she

---

Deputy Warden for Treatment would be Bob Sumasco [phonetic].  Q: And you are the direct
supervisor for the Deputy Warden for Treatment, correct?  A: Correct.  Q: Do you have any role
in the development of medical policies here at the prison?  A: No.  Q: Who develops those
policies?  A: That would be the medical doctor, the medical.  You know, depending on what it
is.  If it was a mental health situation, it would be a psychiatrist.").

   [13] See (Doc. 112, Audio 12/04/08, Afternoon, 00:35:36 - testimony of Sgt. Steberger)
("Q: And you said you had an undergraduate degree in psychology, right?  A: Mm-hmm. . . . Q:
What about at the prison?  Any training at the prison about recognizing people with depression or
other kinds of problems?  A: Each year we attend a class, all staff attend a class, on mentally ill
and suicidal inmates.").

   [14] See (Doc. 111, Audio 12/04/08, Morning, 01:50:24 - testimony of Deputy Warden
Siemasko) ("Q: Have you attended training relating to dealing with individuals with mental
illness?  A: Yes I have.  Q: How often?  A: Whenever it's offered.  I think it's offered once a
year.").

   [15] See (Doc. 111, Audio 12/04/08, Morning, 00:17:52 - 00:19:08 - testimony of Traci
Guynup) ("Q: And, Ms. Guynup, during your first incarceration at Lancaster County Prison, you
would agree with me that you were treated by Dr. Powers?  A: Yes.  Q: You were treated by Dr.
Mory?  A: Yes.  Q: You were treated by Dr. Doe?  A: Yes.  Q: You were treated by a variety
of nurses?  A: Yes. . . . Q: And you got counseling from Laurie Deamer?  A: I received
counseling from Laurie Deamer.  Q: And you received counseling from Chaplain Karin White?
A: Yes.  Q: You received counseling from Father Geiger?  A: Yes.  Q: And, uh, you met with,
uh, mental health supervisors [sic] Carrie McWilliams?  A: I met with Carrie McWilliams,
MHMR specialist.  Q: And Bonnie Bair?  A: Yes.  Q: And Amanda McFerrin?  A: Yes. ).

-8-

could not dispute prison records that indicate she received treatment in the medical department of the prison over 22 times during that nine-month stay.[16]

Testimony from both a counselor and a psychiatrist that regularly reviewed Ms. Guynup during the nine-month stay provide a more detailed account of the extent and regularity of the treatment. First, a counselor in the prison, Carrie McWilliams, testified that she regularly met with Ms. Guynup; on average, they would meet once a week.[17] Dr. Mory, the prison psychiatrist during Guynup's incarceration, noted that he kept in contact with Ms. McWilliams while she counseled Ms. Guynup and that she regularly updated him on her mental health status.[18] Dr. Mory also testified that he regularly saw Ms. Guynup at the psychiatric clinic in the prison.[19] At trial, he provided a detailed account of his almost monthly check-ups, his thoughts and impressions of Ms. Guynup's psychiatric status during those check-ups, and his frequent efforts

---

[16] See (Doc. 111, Audio 12/04/08, Morning, 00:19:09 - 00:20:26 - testimony of Traci Guynup) ("Q: You received [sic] in, uh, the medical department of Lancaster County Prison over twenty-two times in nine months, correct? . . . Q: Ms. Guynup, if the records reflect that you received treatment over twenty-two times in nine months period in the Lancaster County Prison record, you have no way to dispute that, do you? A: No, I don't have any way to dispute that.").

[17] See (Doc. 111, Audio 12/04/08, Morning, 02:40:05 - testimony of Carrie McWilliams) ("Q: Did you meet with Ms. Guynup? A: Yes. Q: And how often would you meet with Ms. Guynup? A: Actually, pretty often. Once a week, average. Sometimes it was a lot more, and sometimes it was not at all for a week. But it averaged out.").

[18] See (Doc. 97, Audio 12/05/08, Early Morning, 00:35:12 - testimony of Dr. Mory) (testifying that the prison counselors assisted Dr. Mory in providing information concerning prisoners and contacting the county mental health office; "Q: And would Carrie McWilliams [one of the counselors] speak to you about Traci Guynup and any concerns that she might have? A: Yes, I'm sure she would speak to me about any concerns she had or any problems that occurred between visits.").

[19] See (Doc. 112, Audio 12/04/08, Afternoon, 02:02:04 - 02:17:36); (Doc. 97, Audio 12/05/08, Early Morning, 00:03:00 - 00:46:46) (testimony of Dr. Mory).

to regulate Ms. Guynup's prescription medications.[20]

To the extent that Ms. Guynup challenged the quality of the psychological treatment that she received, Defendants provided the expert testimony of Dr. Michals that the prison's diagnosis of Ms. Guynup was appropriate and that their treatment of her was reasonable.[21]  Guynup did not present any expert testimony to rebut those conclusions.

In whole, Guynup fails to provide a compelling argument that the verdict "cries out to be overturned or shocks [this Court's] conscience."  Klein, 992 F.2d at 1290.  The statements that she relies on focus on the prison's training for employees regarding the ADA.  However, other

---

[20] (Doc. 112, Audio 12/04/08, Afternoon, 02:06:05) ("Q:  And during your work at Lancaster County Prison, did you have occasion to treat Traci Guynup?  A:  Yes, I did."); (Doc. 112, Audio 12/04/08, Afternoon, 02:06:46) ("Q:  Upon incarceration, was Ms. Guynup evaluated by a psychiatrist?  A:  Yes, she was. . . . Her first evaluation was done by a psychiatrist whose name is Dr. Stephen Powers."); (Doc. 112, Audio 12/04/08, Afternoon, 02:11:55) (reviewing a prison psychiatric intake evaluation form and commenting that, after seeing several entries circled as yes, "It looks as though part of the form says to notify the MH/MR, which is a county agency outside the prison.  It says, 'Notify MH/MR if any of these questions are answered with a yes.'  So that triggers a – communication to the county mental health agency."); (Doc. 112, Audio 12/04/08, Afternoon, 02:15:12; Doc. 97, 12/05/08, Early Morning, 00:03:00) (stating that MH/MR had been contacted by prison medical staff in conducting review for Ms. Guynup in medical visit of December 13, 2005); (Doc. 97, Audio 12/05/08, Early Morning, 00:04:30) (testifying that Ms. Guynup saw Dr. Powers, a psychiatrist, on December 16, 2005); (Doc. 97, Audio 12/05/08, Early Morning, 00:11:15) (testifying that Ms. Guynup refused the medication that the medical staff prescribed at least twice in December 2005); (Doc. 97, Audio 12/05/08, Early Morning, 00:12:40) (stating that Ms. Guynup was seen by Dr. Mory on January 26, 2006); (Doc. 97, Audio 12/05/08, Early Morning, 00:18:10) (testifying that Ms. Guynup was seen by Dr. Mory on March 2, 2006); (Doc. 97, Audio 12/05/08, Early Morning, 00:20:52) (stating that Ms. Guynup was again seen in psychiatric clinic on May 18, 2006); (Doc. 97, Audio 12/05/08, Early Morning, 00:23:07) (noting that Ms. Guynup was seen in the prison psychiatric clinic on July 20, 2006).

[21] See (Doc. 112, Audio 12/04/08, Afternoon, 01:14:05 - testimony of Dr. Michals) (admitted as expert); (Doc. 112, Audio 12/04/08, Afternoon, 01:20:45 - testimony of Dr. Michals) (concluding, after a review of the records, that the diagnosis of Ms. Guynup by the Lancaster County prison staff was appropriate; also concluding that the prison's evaluation and treatment of Ms. Guynup were appropriate and reasonable).

statements made during the trial suggest that the prison actually did have training sessions concerning handling inmates with disabilities, though not formally labeled as "ADA training." Guynup's reliance on these statements for the current Motion is also too narrow; she fails to identify how she was actually mistreated in prison and fails to argue that any specific mistreatment was caused by a specific failure in the prison's training program. See Hogan v. City of Easton, 2006 WL 2645158, at * (E.D. Pa. Sept. 12, 2006) (Padova, J.) (granting motion for summary judgment for defendant city on ADA claim; holding that the defendant city "cannot be liable for a violation of the nondiscrimination mandate of Title II of the ADA because the facts do not establish the required causal connection between the City's allegedly inadequate training and the [City of Easton] Officers' treatment of [the plaintiff]"). The evidence offered by Defendants concerning her treatment, though, indicates that Ms. Guynup was provided medical treatment for her psychological conditions throughout her stay as a pretrial detainee and that such treatment was reasonable. This Court will therefore deny Plaintiff's Motion for a New Trial as it relates to the great weight of the evidence argument.

### B.   PLRA Physical Injury Requirement Jury Charge

Next, Guynup contends that this Court improperly charged the jury on the issue of damages and physical injury. During the jury instruction on damages, this Court stated:

> Under a federal statute enacted by Congress, no damages may be awarded to a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury. The law requires a showing of more than a de minimis physical injury in order to recover on allegations of emotional injury. Now, with that, I just want to explain what that means in plain language. You should first inquire whether, if you find any defendants liable, whether Ms. Guynup suffered any physical injury and initially

-11-

> determine how much compensatory damages she's entitled to for
> that. You may then consider whether you want to also add any
> damages for emotional or mental harm. However, if you find that
> there are no damages for physical injury, then you can't award any
> damages merely for emotional or mental harm.

(Doc. 98, Audio 12/05/08, Mid-Morning, 03:09:35). In making this instruction, this Court relied

on 42 U.S.C. § 1997e(e),[22] which was enacted by the Prison Litigation Reform Act of 1995

("PLRA"). Guynup argues that the PLRA does not apply to her claim, and, therefore, this

damages instruction was inappropriate.

In determining whether the PLRA's damages limitation applies to a civil action, the Third

Circuit has stated that "the applicability of the personal injury requirement of 42 U.S.C. §

1997e(e) turns on the plaintiff's status as a prisoner, not at the time of the incident, but when the

lawsuit is filed." Abdul-Akbar v. McKelvie, 239 F.3d 307, 314 (3d Cir. 2001).

In this case, Guynup filed an initial complaint on September 26, 2006 when she was out

of prison. (Doc. 1). However, that complaint did not contain the required filing fee, and no

application to proceed in forma pauperis had been filed. This Court therefore dismissed the

complaint, and the case was closed. (Doc. 2). It was not until Guynup filed a proper application

to proceed in forma pauperis (Doc. 5) and this Court granted the application (Doc. 7) that the

lawsuit was formally and effectively "filed." At this time, Ms. Guynup was in the custody of the

Lancaster County Prison and therefore subject to the PLRA's damages requirement. As this

Court recognized during argument with counsel, see (Doc. 98, Audio 12/05/08, Mid-Morning,

03:39:55); (Doc. 100, Audio 12/08/08, 00:00:00), Guynup's effective date of filing requires that

---

[22] 42 U.S.C. § 1997e(e) provides that: "No Federal civil action may be brought by a
prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury
suffered while in custody without a prior showing of physical injury."

-12-

her civil action be governed by the damages requirement under § 1997e(e).

Guynup relies on two cases in arguing that the Amended Complaint is the filing that determines whether the PLRA governs, Scherer v. Pa. Dept. of Corrections, 2007 U.S. Dist. Lexis 84935 (W.D. Pa. 2007) and United States v. L.D. Caulk Co., 114 F. Supp. 939 (D. Del. 1953).[23] Guynup contends that the ADA claim was only added in the Amended Complaint, and, as Ms. Guynup was no longer in prison at the time of filing the Amended Complaint, the PLRA does not control.

As to the Scherer case, 2007 U.S. Dist. Lexis, at *138-39, the opinion simply considered a plaintiff's option to file an amended complaint as a matter of course where no responsive pleading had been filed and where the previous amended complaint was made with leave of the court. Judge Gibson, in referring to the plaintiff's opportunity to file as a matter of course after one amended complaint had already been filed, stated:

> An amended pleading supercedes the original and the original pleading no longer serves any function in the case. Therefore, it is as if the pleading in this case is re-commenced with the filing of the Amended Complaint and [certain defendants] have not filed answers to the Amended Complaint but chose to file motions to dismiss and alternative motions for summary judgment. The Plaintiff therefore is free to file his Second Amended Complaint to add a negligence claim against [these defendants].

Id. at *139. The opinion is limited to the ability to amend the complaint. Judge Gibson did not in any way consider the requirements of the PLRA. As to the Caulk case, this opinion again only holds that an amended pleading supercedes a prior pleading. 114 F. Supp. at 940.

_____

[23] Guynup also cites 6 Charles A. Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 1476, at 556-58 (2d ed. 1990 & Supp. 2007) in support of her argument. However, this section of Wright & Miller supplies propositions similar to those offered by the cases Guynup cites and does not speak to the requirements of the PLRA.

In the Abdul-Akbar case, the Third Circuit, in support of its holding on § 1997e(e), cites an en banc opinion from the Eleventh Circuit, Harris v. Garner, 216 F.3d 970, 974-975 (11th Cir. 2000). In that case, the plaintiffs had filed when they were prisoners, but they were then released. The plaintiffs then amended their complaint to indicate that they were no longer prisoners subject to the PLRA's requirements. The Eleventh Circuit held that the filing date of the amendment could not overcome the requirements of the PLRA:

> The status that counts, and the only status that counts, for purposes of section 1997e(e) is whether the plaintiff was a 'prisoner confined in a jail, prison, or other correctional facility' at the time the federal civil action was 'brought,' i.e., when it was filed. It is an undisputed historical fact that all of these plaintiffs were confined in a Georgia prison or correctional facility at the time their complaint was filed.

Id. at 981.

In enacting 42 U.S.C. § 1997e(e), Congress has required this Court to look at when the original, effective complaint was filed to determine whether the plaintiff is a prisoner. As the effective time of filing occurred while Ms. Guynup was in prison, the PLRA controls, and this Court's instruction was therefore proper.

However, as the jury never addressed the issue of damages due to their verdict of no liability (Doc. 107), even if there was an error in the instruction to the jury on damages, that error was harmless. See Markovich v. Bell Helicopter Textron, Inc., 805 F. Supp. 1231, 1241 (E.D. Pa. 1992) (Cahn, J.) ("The plaintiffs also argue that the court erred in its comments regarding the damages experts . . . . First, the court must note that, since the jury never reached the issue of damages because it found that the bolt in question was not defective, any error relating to the damages instructions would be harmless."); 12 Moore's Federal Practice § 61.08 ("Erroneous

-14-

instructions will also be harmless error if, in light of the jury's verdict they were irrelevant. For example, an error in the definition of damages is harmless if the jury finds no liability.").

### C.   Objection to Physical Injury Charge Outside of Hearing of Jury

Finally, Guynup argues that it was error for this Court to require Plaintiff's counsel to object to the jury charge concerning the PLRA's physical injury requirement within the hearing of the jury in violation of Rule 51(b)(2) of the Federal Rules of Civil Procedure. Rule 51(b)(2) provides that: "The court: . . . must give the parties an opportunity to object on the record and out of the jury's hearing before the instructions and arguments are delivered." The Third Circuit has provided little instruction on the standards governing Rule 51(b)(2).

First, Guynup's objection to the jury instruction had no merit and was properly overruled by the Court, as discussed above. Second, Plaintiff's counsel had sufficient opportunity to object to the jury instruction during the charge conference that was held outside of the hearing of the jury prior to the jury charge. During the charge conference, this Court specifically raised the issue of whether to charge the jury on this instruction. (Doc. 98, Audio 12/05/08, Mid-Morning, 01:27:30). Plaintiff's counsel had an opportunity to make his objection and any arguments concerning the charge outside of the hearing of the jury at that time. Despite the opportunity, Plaintiff's counsel did not make an objection to the PLRA charge and did not argue that the charge was improper. Only after this Court charged the jury did Plaintiff's counsel make an objection. (Doc. 98, Audio 12/05/08, Mid-Morning, 03:30:50).

Third, at the time Plaintiff's counsel finally did make the objection, he did not request that the objection be made outside of the hearing of the jury. In fact, he specifically requested to make the objection while the jury was still in the courtroom. (Doc. 98, Audio 12/05/08, Mid-

-15-

Morning, 03:30:50) (Plaintiff's counsel: "May I say it?"). In addition, the objection that Plaintiff's counsel made at the time was not the argument that they now rely on. As noted during subsequent argument, the objection made by Plaintiff's counsel after the jury charge was that the PLRA damages instruction should not be applied to the ADA claim in particular. (Id.) It was only later on, during further discussions and while the jury was outside of the courtroom and deliberating, that Plaintiff's counsel finally provided the objection that the PLRA did not apply to Ms. Guynup's action in its entirety. (Doc. 98, Audio 12/05/08, Mid-Morning, 03:38:44).

Finally, Guynup was not prejudiced by the discussion held by the parties in front of the jury. Each of the parties noted their disagreement, and this Court stated that it would consider the objection. (Doc. 98, Audio 12/05/08, Mid-Morning, 03:30:50). And, as noted earlier, the objection made only concerned damages, not liability. As the jury never even reached the issue of damages, no prejudice resulted from a discussion of the objection in front of the jurors.

An appropriate Order follows.

-16-

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

TRACI GUYNUP,                          :       CIVIL ACTION
                                       :
            v.                         :
                                       :       No. 06-4315
LANCASTER COUNTY, et al.               :

### ORDER

AND NOW, this 3rd day of March, 2009, for the reasons stated in the foregoing

Memorandum, it is hereby ORDERED that Plaintiff's Motion for New Trial (Doc. 113, 118) is

DENIED.

BY THE COURT:


_____               /s/ Michael M. Baylson
                                       Michael M. Baylson, U.S.D.J.


O:\CIVIL\06-4315 Guynup v. Lancaster County Prison\06-4315 Guynup v. Lancaster County - Memo Re Motion for
New Trial.wpd